Filed 6/10/13  P. v. Gutierrez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Appellant, | E053552 |
| v. | (Super.Ct.No. RIF149458) |
| CRUZ ALONZO GUTIERREZ et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Helios (Joe) Hernandez, Judge.  Affirmed in part, reversed in part.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant Cruz Alonzo Gutierrez.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant Monique Yvonne Garcia.

Paul E. Zellerbach, District Attorney, and Matt Reilly, Deputy District Attorney, for Plaintiff and Appellant.

1

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and William M. Wood and Heather F. Crawford, Deputy Attorneys General, for Plaintiff and Respondent.

In this case, defendants and appellants Monique Yvonne Garcia (hereafter, Defendant Garcia) and Cruz Alonzo Gutierrez (hereafter, Defendant Gutierrez) were convicted by separate juries of attempted murder, assault and active participation in a criminal street gang. Both defendants and the People appeal the judgment.

Defendant Gutierrez contends: (1) his statement regarding gang affiliation during booking was admitted in violation of his Fifth Amendment right against self-incrimination; (2) the trial court erred by failing to instruct the jury on the meaning of the term "in association with any criminal street gang"; (3) there was insufficient evidence to support the gang enhancement; (4) there was insufficient evidence to support his conviction of active gang participation; (5) he was denied due process when the gang expert was allowed to testify that his acts were committed for the benefit of, in association with, or at the direction of a criminal street gang; (6) the prosecutor committed misconduct in failing to properly prepare the witnesses; (7) CALCRIM No. 372 is unconstitutional; and (8) the trial court abused its discretion in denying his posttrial *Marsden*[1] motion.

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

2

Defendant Garcia contends: (1) her convictions must be reversed because the prosecutor presented the jury with a legally incorrect theory of conviction; (2) the prosecutor committed misconduct, violating her constitutional rights, by eliciting evidence that the deputies conducted a probationary search of her home, which was prohibited by the court's pretrial rulings; (3) the gang expert improperly opined that she was guilty of the attempted murder and felony assault charges; and (4) the cumulative error doctrine applies. Each defendant joins in the issues raised by the other defendant.

The People appeal, contending the trial court's postverdict dismissal of the gang enhancements and gang offenses constitutes error because there was legally sufficient evidence to support those charges.

## I.  STATEMENT OF FACTS

On March 27, 2009, D.H. celebrated her 13th birthday with a party at her family's home in Moreno Valley. Her adult sisters, Priscilla and Christina, served as chaperones, along with Christina's boyfriend, Ricardo Williams, also called Scrappy. More than 10 teenagers attended the party, including 14-year-old J.G., who came as a friend of one of the guests. About 11:00 p.m., Christina and Williams left, and J.G. sent a text message to her sister, Defendant Garcia, for a ride home.

Defendant Garcia arrived at the house and pounded on the back door. When she walked in, she asked for J.G., acting "crazy, upset about something." Although her sister was in the next room, Defendant Garcia yelled and screamed, saying, "'Where's my sister?'" A 16-year-old "skinny guy" named Jonathan O. (also called "Fez") said something like, "'The party's in my pants,'" or "'She's in my pants.'" As Defendant

3

Garcia became angry and yelled and cursed at Jonathan, she told J.G., "'Go to the car or I'm going to slap you.'"

Defendant Garcia announced that she had friends from Edgemont and was going to have "'Tokes, Toker, . . . something to that effect'" come over, "'bring a strap'" and "take care of this kid'" and "'hit up the house.'" Defendant Gutierrez is known as "Tokes." Jonathan apologized; however, Defendant Garcia said it did not matter, and that he needed to be "taken care of and taught a lesson." She called someone and told the person to "'bring the homies,'" "'bring guns,'" and "'you need to get over here and handle these people.'" Jonathan heard her say "Tokes" during the call.

Concerned that something bad would happen, Priscilla called Christina and told her someone was threatening to shoot up the house, and asked if Williams would return with help. Christina could hear someone yelling in the background that sounded like, "'[b]ring a strap,'" or "'bring guns,'" and "'[c]ome over [and] . . . shoot everybody up,'" but she assumed the argument was among some of the kids at the party. Christina sent Williams back to the party to check on the situation.

Meanwhile, D.H.'s mother told Defendant Garcia to leave, and the two argued outside. Defendant Garcia remained on the phone, telling the person on the other end to hurry up. When Williams arrived, he attempted to defuse the situation. He reminded Defendant Garcia there were children in the house and that Jonathan was just a kid who had made an offensive comment. Defendant Garcia said she did not care, that she was calling her "homies from Edgemont," and that something was going to happen. She added, "'No one disrespects me.'"

4

A red car pulled up and three men wearing black hoodies and gloves got out. Williams thought the men were dressed in all black, as if "on a mission." Defendant Garcia pointed to D.H.'s mother and told the men, "'Hey, that's the bitch right there.'" After asking Defendant Garcia whether this was really necessary, Williams turned to D.H's mother and said, "'This don't look good.'" Williams saw that one of the men had a gun that he later recognized as a revolver. He walked into the street to try to dissuade the men, saying, "[T]his ain't going down right here." Someone told him, "'Step to the side, because it is.'" At some point, Williams shouted, "'Run,'" and D.H.'s mother ordered the kids into the house.

As Williams prepared to fight the man with the gun, another man "sliced" Williams's throat. The man with the knife said, "'Blast that fool,'" and the gunman shot Williams in the arm. Several more shots were fired as Williams ran away. During the attack, one or more of the assailants said, "'Edgemont, Edgemont.'"

After Williams left, Christina decided to drive back to the party. As she turned onto Fay Avenue, she saw him running toward the car "drenched in blood [and] holding his throat." Two or three men dressed in dark clothing chased him and one was shooting at him.[2] Williams got into Christina's car and the men turned around. Christina saw the gunman get into a white van, which sped off.

That same night, Jonea Garcia, who lived with her sisters, Defendant Garcia and J.G., answered the door to find three men—Defendant Gutierrez, Alfredo Avila (Vago)

_____

[2] Investigators discovered a bloody knife and possible bullet strike marks a few houses from D.H.'s house; however, no bullets were found.

and an unknown man—looking for Defendant Garcia. At trial, Jonea claimed that only two men, not including Defendant Gutierrez, had come to the house. The men said they would wait in the garage for Defendant Garcia to return. Jonea did not know whether the men waited.

About 4:00 a.m., Riverside County Sheriff's deputies went to Defendant Garcia's home and found several people, including J.G. and both defendants. During a search of the residence, deputies discovered ammunition in the garage and a loaded revolver and speed loader hidden in a couch cushion. The revolver previously had been reported stolen.

Deputy Gabriel Dennington of the Riverside County Sheriff's Department also found a cell phone and turned it on. The phone displayed a photograph of Defendant Gutierrez and an Edgemont Locos gang member called "Listo" with their shirts off. Defendant Gutierrez claimed the phone did not belong to him. Deputy Dennington used the phone to dial Defendant Garcia's cell phone number. Her phone identified "Tokes" as the incoming caller. It was later learned that Defendant Garcia had called Defendant Gutierrez on the night of the shooting at 11:43 and 11:45 p.m., and at 1:49 the following morning.

During her interview with Detective Lance Colmer of the Riverside County Sheriff's Department, J.G. initially refused to identify anyone involved in the shooting. She told Detective Colmer that she did not "trust cops." She said, "'I'm glad that fool got blasted.'" J.G. ultimately identified Avila as one of the assailants and stated repeatedly and with certainty that Defendant Gutierrez was the shooter. She told the detective all

6

three men were from Edgemont, but she only knew Tokes. She had known Defendant Gutierrez for four years and thought of him as a big brother. She claimed Williams was holding a knife when he walked up to Avila and Defendant Gutierrez that night.

At trial, J.G. again identified Avila and Defendant Gutierrez as two of the assailants, but claimed that Defendant Gutierrez was not the shooter and that she had been unable to see what happened because she had not been wearing glasses or contacts. J.G. admitted telling Detective Colmer she was wearing contacts that night but claimed at trial that she had lied to the detective and had no idea why. She said it would not help to look at the transcript, that she could not recall any of that year.

Detective Colmer opined that Edgemont Locos was a criminal street gang with 75 to 100 active gang members at the time of the shooting. Edgemont Locos was also known as "Edgemont," "EML," and "Lokos," and included gang subsets "Night Owls," "Cholilos," and "Spantos." Edgemont gang members commonly used these symbols in graffiti, tattoos and on clothing. Edgemont's primary activities included graffiti, narcotics sales, and violent felony assaults. Detective Colmer outlined several cases involving crimes committed by the gang's members.

Detective Colmer opined that Defendant Gutierrez was a member of the Edgemont Locos gang who went by the moniker "Tokes." He based his opinion on a review of police reports and field interview cards where the defendant wore gang clothing, admitted being an Edgemont gang member, and was contacted on Edgemont gang territory in the company of other active Edgemont gang members. Detective Colmer also relied on

7

testimony in the instant case that Defendant Gutierrez said "Edgemont" during the attack and that Defendant Garcia had stated she was calling people from Edgemont.

Detective Colmer opined that Defendant Garcia was an associate of the Edgemont Locos gang on the day of the shooting. An associate of a gang may be a girlfriend, relative, or someone else who has repeated contact with members of a gang and assists that gang in various ways, i.e., by providing meals, transportation, or a safe house, but has not gone through the process of becoming a full-fledged gang member. Detective Colmer believed Defendant Garcia was an Edgemont associate because she made references to Edgemont and said she was calling her "homies" while arguing with people at the party. The detective explained that people unaffiliated with a gang generally do not invoke that gang's name in making threats, or call members of that gang to carry out such threats. Moreover, one witness saw Defendant Gutierrez flee in Defendant Garcia's white van; Defendant Gutierrez was arrested at Defendant Garcia's home; a gun consistent with the crime weapon was discovered in Defendant Garcia's home; two known Edgemont gang members had come to Defendant Garcia's home to see her after the shooting; and there had been cell phone correspondence between Defendants Garcia and Gutierrez just before and after the shooting. Finally, Defendant Garcia's telephone contained contact information not only for Defendant Gutierrez ("Tokes") and Avila ("Vagos") but for numerous other individuals known to be Edgemont gang members.

Detective Colmer opined the attack on Williams was committed at the direction of and in association with the Edgemont Locos criminal street gang. The detective testified that Avila was known to be a senior member of the Edgemont gang, and that the order to

8

Defendant Gutierrez to "Blast him," indicates the crime was committed at the direction of the Edgemont gang. Defendant Garcia's telephone call also indicated planning and direction by causing Edgemont gang members to respond to the house in a violent manner. Defendant Gutierrez acted in association with his gang not only by committing the crime with at least one other Edgemont gang member and at the behest of Defendant Garcia, an associate, but also by verbally announcing his association with Edgemont just before shooting Williams. Detective Colmer added that the gang would also benefit by providing "experience" for its members and by increasing its street reputation for committing violent acts.

During a routine jail admission interview on March 29, 2009, a Riverside County sheriff's classification deputy asked Defendant Gutierrez if he had any gang affiliation. Defendant Gutierrez denied any gang affiliation but gave the impression he was associated with the Edgemont Locos gang and that his nickname with the gang was "Junior."

Both defendants were charged with attempted, deliberate and premeditated murder with a firearm use allegation, (Pen. Code,[3] §§ 664, 187, subd. (a), and 12022.53, subds. (d) and (e); count 1); assault with a firearm (§ 245, subd. (a)(2); count 2); assault with a deadly weapon, a knife, (§ 245, subd. (a)(1); count 3); and actively participating in a criminal street gang (§ 186.22, subd. (a); count 4). As to counts 1, 2 and 3, it was further alleged as to Defendant Gutierrez that he personally inflicted great bodily injury

---

[3] All further statutory references are to the Penal Code unless otherwise indicated.

9

(§ 12022.7, subd. (a)), and as to both defendants that the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)).

## II.  ADMISSION ANSWERS TO BOOKING QUESTIONS

Defendant Gutierrez contends the trial court violated his Fifth Amendment right against self-incrimination by admitting statements he made about his association with the Edgemont Locos while being processed for admission to jail.

### A.  Further Background Information

As part of the routine booking process, deputies assigned to the Riverside County sheriff's classification department ask inmates about their gang affiliation for jail classification, housing, and security purposes.  During a booking interview, Correctional Deputy Kristen Morris of the Riverside County Sheriff's Department asked Defendant Gutierrez whether he was "gang-affiliated" and whether he "h[ung] out" with any gang members.  The questions were taken from a standardized form.  Defendant Gutierrez denied any gang affiliation but said he "h[ung] out" with members of the Edgemont Locos gang and that his nickname with them is "Junior."

Prior to trial, Defendant Gutierrez moved to exclude his booking statements to Deputy Morris on the grounds such admission would violate his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  According to defense counsel, Deputy Morris was aware that gang charges were pending against Defendant Gutierrez during the interview and that she should have realized gang questions would elicit incriminating responses.  Observing that booking officers ask about gang status in every case regardless

10

of pending gang charges, the trial court ruled that the statements were admissible under the routine booking question exception. However, regarding Defendant Gutierrez's statements made during an unrelated 2008 drug arrest when he admitted he was an Edgemont gang member, the trial court excluded them pursuant to Evidence Code section 352.

## B. Legal Principles and Analysis

California and federal courts have long applied the booking question exception to *Miranda*. (See, e.g., *People v. Rucker* (1980) 26 Cal.3d 368, 387, superseded by statute as stated in *People v. Gomez* (2011) 192 Cal.App.4th 609, 630, fn. 11 (*Gomez*); *Presley v. City of Benbrook* (5th Cir. 1993) 4 F.3d 405, 408, fn. 2; *United States v. Booth* (9th Cir. 1981) 669 F.2d 1231, 1238; *United States ex rel. Hines v. LaVallee* (2d Cir. 1975) 521 F.2d 1109, 1112-1113.) "The fact that the information gathered from routine booking questions turns out to be incriminating does not, by itself, affect the applicability of the exception. [Citations.] In *United States ex rel. Hines v. LaVallee*[, *supra*,] 521 F.2d 1109, for example, an assailant told his robbery and rape victim during the commission of the crimes that he had been married 11 years and had two children. [Citation.] After the defendant was arrested and before being *Mirandized*, he was asked 'background data (i.e., his name, address, age, marital status) . . . .' [Citation.] He told the officer that he had been married for 11 years and had two children. [Citation.] Although the response was incriminating, the Second Circuit held that it was admissible because it 'constituted merely basic identification required for booking purposes . . . .' [Citation.]" (*Gomez*, *supra*, at pp. 629-630.)

11

"""[R]ecognizing a 'booking exception' to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception.  Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during the booking, that are designed to elicit incriminatory admissions."'  [Citation.]  The use of the phrase '*designed* to elicit incriminatory admissions,' instead of the more objective '*reasonably likely* to elicit an incriminating response' language . . . suggests that the intent of the interrogating officer is more important in evaluating the applicability of the booking question exception than in establishing interrogation generally."  (*Gomez*, *supra*, 192 Cal.App.4th at p. 629, fn. omitted.)  Thus, "the booking question issue requires careful scrutiny of the facts and circumstances in each case," because "[w]hether the administrative purpose is a mere guise or pretext for questions actually designed to elicit incriminating responses is a close question."  (*Id*. at pp. 634, 635; *U.S. v. Washington* (9th Cir. 2006) 462 F.3d 1124, 1132-1133 [question eliciting the defendant's gang moniker was a "routine booking question" despite the fact his moniker ultimately provided a link in the evidentiary chain of evidence].)

In *Gomez*, the defendant was asked questions about his gang affiliation for jail security purposes.  (*Gomez*, *supra*, 192 Cal.App.4th at p. 632.)  Finding such questions within the *Miranda* exception, this court observed, "The classification of inmates by gang affiliation for jail security purposes can be a legitimate administrative concern. . . .  Thus, there does appear to be a legitimate administrative purpose for the question."  (*Gomez*, *supra*, at p. 634.)  Similarly, in this case Defendant Gutierrez was asked legitimate booking questions pursuant to a standard booking form, which allowed Deputy Morris,

12

who was uninvolved with the investigation of the crimes, to classify him by gang affiliation. Defendant disagrees with this court's opinion in *Gomez*, asserting that "gang affiliation questions inherently are designed to elicit incriminating information" because of the "frequency of gang charges and enhancements, as well as the admissibility of gang evidence generally . . . ." Thus, Defendant Gutierrez argues that such questioning "should not be deemed to fall within the booking exception to *Miranda*." We disagree.

To begin with, we decline Defendant Gutierrez's invitation to reverse our decision in *Gomez*. More importantly, on the record before this court, we cannot say that the gang-related questions asked are outside the booking question exception. The questions appear to have been asked in a legitimate booking context, by a booking deputy who was not involved with the arrest or investigation of the crimes, pursuant to a standard booking form. Thus, the questions were asked for legitimate, noninvestigatory purposes related to the administration of the jail and concerns for the security of the inmates and staff. Significantly, there is no evidence Deputy Morris had any knowledge of the crimes for which Defendant Gutierrez was arrested or was suspected of committing. The interview took place on March 29, 2009, less than 48 hours after the commission of the crimes. Although Defendant Gutierrez was ultimately charged on August 13, 2009, with certain gang enhancements, our record does not indicate whether the arresting deputies indicated it was a gang-related crime in any pre-booking report or, if they had, whether Deputy

13

Morris had seen such a report or talked to the deputies.[4]  Rather, the initial felony complaint filed on April 2, 2009, does not charge Defendant Gutierrez with any gang enhancements or gang-related crimes.  Thus, there is a strong inference there was no indication this was a gang-related crime in any prebooking report.

For the above reasons, we hold that the prosecution satisfied its burden of showing by a preponderance of the evidence that the questions about Defendant Gutierrez's gang affiliation were booking questions not designed to elicit an incriminating response.  Thus, his responses were admissible notwithstanding the absence of *Miranda* warnings.

### III.  FAILURE TO INSTRUCT ON THE TERM "IN ASSOCIATION WITH ANY CRIMINAL STREET GANG"

The jury was instructed on the elements of the criminal street gang enhancement pursuant to CALCRIM No. 1401 as follows:  "To prove this allegation, the People must prove that:  [¶]  1.  The defendant committed the crimes charged for the benefit of, at the direction of or *in association with a criminal street gang*;  [¶]  AND  [¶]  2.  The defendant intended to assist, further, or promote criminal conduct by the gang members."  (Italics added.)  Defendant Gutierrez faults the trial court for failing, sua sponte, to provide the jury with a clarifying instruction on the meaning of the term "in association

---

**4** We note that in his opening brief, Defendant Gutierrez claims that trial counsel "argued that the booking officer was aware of the gang allegation at the time [Defendant] Gutierrez was being booked so that his statement regarding gang affiliation was necessarily incriminating."  However, the record before this court lacks evidence to support such claim.  Instead, the absence of gang-related allegations in the initial felony complaint filed less than four days after the interview suggests that the booking officer was not aware of gang allegations.

14

with a criminal street gang." He claims that "[u]nder the holding of the California Supreme Court in the case of *People v. Albillar* (2010) 51 Cal.4th 47, 60-62 [(*Albillar*)], 'in association with a criminal street gang' is a legal term with a specific definition that needed to be provided to the jury." In response, the People argue the pattern jury instruction in CALCRIM No. 1401 sufficiently instructed the jury on the law and that no further instruction was required absent a request.

"The trial court has a sua sponte duty to give correct instructions on the basic principles of the law applicable to the case that are necessary to the jury's understanding of the case. [Citation.] That duty requires the trial court to instruct on all the elements of the charged offenses and enhancements. [Citation.]" (*People v. Williams* (2009) 170 Cal.App.4th 587, 638-639 [Fourth Dist., Div. Two].) When the terms are used as commonly understood, the court has no obligation to define them absent a request for amplification or explanation.

Citing *Albillar*, *supra*, 51 Cal.4th at pages 60 and 73, Defendant Gutierrez asserts that the term "'in association with any criminal street gang' requires a showing that [he] 'relied on . . . common gang membership and the apparatus of the gang in committing' the charged crimes." We disagree.

In *Albillar*, three fellow gang members were convicted, inter alia, of forcible rape in concert and forcible sexual penetration in concert. In rejecting the defendants' contention that there was insufficient evidence to support the jury's implied finding that the sexual offenses were committed in association with their gang, the Supreme Court pointed out the gang expert's testimony regarding elements of gang membership and

15

reasons for gang members committing crimes. (*Albillar*, *supra*, 51 Cal.4th at pp. 60-61.) Tying in the facts of the case with the expert's testimony, the court concluded, "Defendants not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together. They relied on the gang's internal code to ensure that none of them would cooperate with the police, and on the gang's reputation to ensure that the victim did not contact the police. We therefore find substantial evidence that defendants came together as *gang members* to attack [the victim] and, thus, that they committed these crimes in association with the gang. [Citations.]" (*Id.* at pp. 61-62.)

At this point in the opinion, the California Supreme Court cited, inter alia, *People v. Ochoa* (2009) 179 Cal.App.4th 650, 661, fn. 7 [Fourth Dist., Div. Two] ("the fact that . . . the defendant had a fellow gang member in the stolen vehicle with him would support a finding that he acted in association with the gang. [Citation.]"); *People v. Morales* (2003) 112 Cal.App.4th 1176, 1179, 1198 [Fourth Dist., Div. Two] ("it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang. Here, however, there was no evidence of this. Thus, the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members"); and *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1332 ("Defendant, [an admitted gang member], committed the crimes with . . . another admitted member. . . . [The gang expert] testified this evidence showed defendant committed the robbery in association with the gang. The

16

elements of the gang enhancement may be proven by expert testimony. [Citation.]"). As the People aptly observe, the *Albillar* court did not provide a new definition for the phrase "in association with any criminal street gang," which must be used in future cases. Rather, our state's highest court simply described how the evidence was sufficient in the case before it to support the true findings on the elements of the criminal street gang enhancement. Accordingly, *Albillar* did not create any duty on the trial courts to define, sua sponte, this term for the jury. Here, absent defense counsel's request for further instruction on the term "in association with a criminal street gang," the trial court's failure to define the term did not amount to instructional error.

## IV. EVIDENCE TO SUPPORT GANG ENHANCEMENT

Defendant Gutierrez argues there was insufficient evidence the crime was committed "for the benefit [of], at the direction of, or in association with" any criminal street gang. We disagree.

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also

17

reasonably be reconciled with a contrary finding. [Citation.]" (*Albillar*, *supra*, 51 Cal.4th at pp. 59-60.)

A gang enhancement applies when the defendant committed the underlying felony (1) "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).)

Here, the evidence supports the conclusion that Defendant Gutierrez committed the offenses for the benefit of, at the direction of, or in association with the Edgemont Locos criminal street gang.[5] To begin with, Defendant Garcia called her "homies" after she believed that she had been disrespected. She announced that she had friends from Edgemont and was going to have them come over and "hit up the house." Witnesses heard Defendant Garcia yelling, "Bring a strap [or] bring guns," and "Come over [and] . . . [s]hoot everybody up." This call indicates planning and direction, supporting the conclusion that the attack on Williams was at the direction of the Edgemont Locos gang. In response, three gang members, including Defendant Gutierrez and Avila, showed up armed and dressed as if they were on a gang mission. Avila stabbed Williams and then ordered Defendant Gutierrez to shoot Williams. J.G. confirmed that all three men were from Edgemont. Both defendants specifically referenced Edgemont during the incident. Defendant Garcia referred to the gang when she threatened Jonathan and called Defendant Gutierrez to respond to Jonathan disrespecting her, and Defendant Gutierrez

---

[5] We analyze this same issue as to Defendant Garcia later in this opinion.

18

announced "Edgemont" just before shooting Williams. Clearly, Defendant Gutierrez acted in association with Edgemont gang members during the attack.

Finally, the attack benefitted the Edgemont Locos gang by providing "experience" for its members and by increasing the gang's street reputation for committing violent acts. Again, the gang members announced "Edgemont" before the attack. Such announcement supports a finding that the attack was committed to benefit the gang.

## V. EVIDENCE OF GANG OFFENSE

Defendant Gutierrez challenges the evidence supporting his conviction for actively participating in a criminal street gang. (§ 186.22, subd. (a).) Section 186.22, subdivision (a), has three elements: (1) "Active participation in a criminal street gang, in the sense of participation that is more than nominal or passive"; (2) "'knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity'"; and (3) "'"willfully promot[ing], further[ing], or assist[ing] in any felonious criminal conduct by members of that gang." [Citation.]' [Citation.]" (*People v. Lamas* (2007) 42 Cal.4th 516, 523.) Defendant Gutierrez argues the evidence was insufficient to show that he had actual knowledge the Edgemont Locos gang engaged in a pattern of criminal gang activity. We disagree.

According to the record before this court, Defendant Gutierrez previously told police that he was a member of the Edgemont gang. On one occasion, he was arrested with three Edgemont gang members while on Edgemont gang "turf" and while wearing gang clothing. The People argue that Defendant Gutierrez's previous admission of being an Edgemont gang member, wearing gang clothing, and being arrested with other

19

members, "supports a reasonable inference he was fully aware of the gang's criminal acts, including the predicate offenses described by the gang expert." Moreover, his attack on Williams further establishes knowledge. One of Edgemont gang's primary activities is violent felony assaults. That is what happened in this case. Defendant Gutierrez arrived at the scene armed with a gun, with two other Edgemont gang members, one of whom possessed a knife. Thus, prior to his arrival, he had already committed the crime of carrying a loaded firearm. (§ 186.22, subd. (e)(33).)

Given the above, the evidence is sufficient to support the knowledge element of the substantive gang offense. Likewise, there is sufficient evidence to support the knowledge element as to Defendant Garcia. Upon feeling "disrespected," she immediately called her "homies" and requested that they "shoot up the place."

## VI. GANG EXPERT'S TESTIMONY

Both defendants challenge the admission of certain portions of Detective Colmer's gang expert opinion testimony. Defendant Gutierrez argues that the expert's opinions "regarding [his] conduct being for the benefit of and in association with the gang were inappropriate and usurped the essential fact-finding role of the jury." Likewise, Defendant Gutierrez criticizes Detective Colmer's opinion regarding the "at the direction of" and "to promote a criminal street gang" prongs. Defendant Garcia faults the trial court for allowing Detective Colmer to opine that she was guilty of attempted murder and assault in violation of her Fifth, Sixth and Fourteenth Amendment rights.

20

## A. Further Background Information

Prior to trial, counsel for Defendant Gutierrez moved to prohibit certain expert opinion testimony regarding gangs. Specifically, counsel objected to any opinion testimony regarding whether Defendant Gutierrez was an "'active participant'" of a gang in March 2009, and whether he committed any of the offenses for the benefit of the gang. Counsel argued that a gang expert is not qualified to testify as to whether a defendant's conduct was accompanied by a particular intent, including gang motivation. A hearing was held on the defense motion, and after hearing the arguments of counsel, the trial court ruled that the gang expert's opinion testimony was admissible.

## B. Legal Principles and Analysis

To be admissible, expert opinion testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion . . . would assist the trier of fact . . . ." (Evid. Code, § 801, subd. (a).) "The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; . . . even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would 'assist' the jury." (*People v. McDonald* (1984) 37 Cal.3d 351, 367, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914 (*Mendoza*).)

"Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.) The admissibility of expert opinion testimony that embraces the ultimate issue "'"depends on the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved. . . ."'" (*People v. Killebrew*

21

(2002) 103 Cal.App.4th 644, 652), disapproved on another point in *People v. Vang* (2011) 52 Cal.4th 1038, 1047, fn. 3 (*Vang*).) It is well settled that in cases where gang offenses and enhancements are alleged, expert testimony regarding the culture, habits, and psychology of gangs is generally permissible because these subjects are "'"'"sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. [Citations.]"' [Citation.]' [Citation.]" (*Killebrew*, *supra*, at p. 656; see also *People v. Gardeley* (1996) 14 Cal.4th 605, 617.) For example, an expert may properly testify concerning "the size, composition or existence of a gang [citations], gang turf or territory [citations], an individual defendant's membership in, or association with, a gang [citations], the primary activities of a specific gang [citations], motivation for a particular crime, generally retaliation or intimidation [citations], whether and how a crime was committed to benefit or promote a gang [citations], rivalries between gangs [citation], gang-related tattoos, gang graffiti and hand signs [citations], and gang colors or attire [citations]." (*Killebrew*, *supra*, at p. 657, fns. omitted.) "A trial court's determination as to whether an expert should be allowed to opine about a particular subject is reviewed on appeal for abuse of discretion. [Citations.]" (*People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001.)

Here, the People posed hypothetical questions to Detective Colmer. Given the hypothetical scenario, the detective opined that the shooter committed his offense in association with, at the direction of, and possibly for the benefit of his gang. Defendant Gutierrez argues the detective's earlier testimony about the importance of respect within the gang culture was sufficient for the jury to conclude that the crimes were committed

22

for the benefit of the Edgemont Locos gang. The People respond that the earlier testimony did not prohibit further testimony on how the commission of crimes benefits the gang by promoting respect. (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1512-1513 [expert may properly testify about whether and how a crime was committed to benefit or promote a gang]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1384) ["it is difficult to imagine a clearer need for expert explication than that presented by a subculture in which this type of mindless retaliation promotes 'respect'"].) Likewise, the People argue that Detective Colmer's opinion that the shooting was committed in association with a criminal street gang was necessary, because "without this testimony it is not apparent that association could be based on more than 'two guys from the same gang commit[ting] a crime together,'" and his opinion that the crimes were committed at the direction of the Edgemont Locos gang was necessary because such conclusion was "not readily apparent without expert testimony regarding the difference between a senior gang member and a subordinate one." We agree with the People.

Regarding Defendant Garcia's challenges, Detective Colmer's opinion that she was an active associate of the Edgemont Locos on the day of the charged crimes was based on her conduct before, during, and after the charged crimes, along with the fact that her cell phone contacts included several Edgemont gang members. The detective relied on the hypothetical scenario in opining that the crimes were committed at the direction of a criminal street gang. Contrary to Defendant Garcia's claim, the detective never commented on her intent or guilt. Rather, as the People assert, he "properly stated the

23

factors on which he relied in forming his opinions, which included evidence adduced at trial concerning [Defendant] Garcia's role in those offenses."

"[N]o statute prohibits an expert from expressing an opinion regarding whether a crime was gang related. Indeed, it is settled that an expert may express such an opinion. To the extent the expert may not express an opinion regarding the actual defendants, that is because the jury can determine what the defendants did as well as an expert, not because of a prohibition against the expert opining on the entire subject. Using hypothetical questions is just as appropriate on this point as on other matters about which an expert may testify." (*Vang*, *supra*, 52 Cal.4th at p. 1052.) Moreover, at least one court has found the admission of an expert witness's opinion that the crimes of the particular defendants in question were committed for the benefit of the respective defendants' gangs, without the use of a hypothetical, was within the trial court's discretion. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 507, 509, cited with approval in *People v. Prince* (2007) 40 Cal.4th 1179, 1227.) Likewise, the court in *Vang*, albeit in dicta, expressed support for that holding: "It appears that in some circumstances, expert testimony regarding the specific defendants might be proper. [Citations.]" (*Vang*, *supra*, 52 Cal.4th at p. 1048, fn. 4.)

Nonetheless, assuming error, we conclude on this record that it is not reasonably probable an outcome more favorable to either defendant would have resulted in the absence of Detective Colmer's testimony. (*People v. Clark* (2011) 52 Cal.4th 856, 940-941 [error in admission of prosecution's expert witness testimony subject to *Watson* standard of harmless error]; *People v. Watson* (1956) 46 Cal.2d 818, 836.) The jury was

24

admonished regarding the use of the expert opinion testimony and that it was up to them to establish if the opinion was accurate or true. (CALCRIM No. 332.) Even without the expert testimony, the words and actions of both defendants, along with their friends, constituted overwhelming evidence of the crimes they were convicted of having committed.

## VII. PROSECUTORIAL MISCONDUCT

Both defendants contend the prosecutor committed misconduct by failing to instruct Deputy Joshua Rhodes not to disclose that the search of Defendant Garcia's apartment was a "probation search." Defendant Gutierrez also claims misconduct based on the prosecutor's failure to instruct the gang expert not to mention Defendant Gutierrez's prior criminal conduct.

### A. Further Background Information

Prior to trial, defense counsel moved to exclude evidence that the search of Defendant Garcia's residence was a Fourth Amendment waiver search. The trial court granted the motion and told the prosecutor, "Make sure your officer knows" that he should simply testify to a search without providing the reason for the search. On direct, Deputy Rhodes testified that he assisted in the investigation of the instant offenses on March 27, 2009. The prosecutor asked, "And what were you specifically tasked with assisting?" The deputy replied, "We were—or they were doing a probation search at a residence, and I was assigned to assist." Defendant Garcia's counsel requested a sidebar conference. After counsel reminded the court of the in limine order excluding any reference to the search of Defendant Garcia's house as being a probation search, the

25

prosecutor accepted blame for Deputy Rhodes's reference: "It's my fault completely, your Honor. . . . I advised Deputy Moreno and Deputy Colmer, and I completely forgot to advise Deputy Rhodes. It's no one's fault but my own. That's all I can say is mea culpa. I'm sorry, it was a lapse of memory." The parties considered their options of correcting the situation and concluded that striking the deputy's entire testimony and starting over was the best option. When the jurors returned to the courtroom, the court instructed: "[W]e're going to strike this deputy's testimony, and you are to forget it. I know that sounds hard. How do you unring the bell? But you're going to do it because you're going to follow my orders. Forget everything he said, and we're gonna start fresh."

In a separate pretrial motion, Defendant Gutierrez moved for "an order barring the admissibility of any prior bad acts evidence and that no reference be made to any alleged criminal conduct including prior convictions or arrests . . . ." Denying the motion, the trial court noted its ruling that Defendant Gutierrez could be impeached with a prior drug conviction should he testify.

On direct examination, the prosecutor asked Detective Colmer for the basis of his expert opinion that Defendant Gutierrez is a gang member. The detective listed several factors, including his "review of police reports, where [Defendant Gutierrez has] committed crimes with other members of Edgemont Locos . . . ." After the next unrelated question, defense counsel requested a sidebar wherein she stated: "We had a discussion with respect to [Defendant] Gutierrez's past criminal history and whether or not those—either arrests or convictions could come in. And I believe the Court's ruling

26

was that those would come in for impeachment purposes only if [Defendant] Gutierrez testified. [¶] But the witness just testified that [Defendant] Gutierrez has been arrested previously for committing crimes with other Edgemont Locos members. I would argue that the similarity with language, that . . . violates that 402 hearing. . . ."[RT 512} In response, the prosecutor argued there had been no mention of any prior conviction, merely Defendant Gutierrez's "FI cards where he was arrested with another Edgemont gang member. That's all that was said." Defense counsel argued that the "existence of FI cards does not necessarily indicate that he was arrested," only that he "had contact with law enforcement and he was with other people." The prosecutor repeated the fact that he did not talk about Defendant Gutierrez's conviction, only his arrests with other Edgemont gang members.

The trial court overruled defense counsel's objection, stating, "It's permissible for an expert, and an arrest doesn't necessarily mean a conviction."

**B. Legal Principles and Analysis**

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" [Citation.]' [Citation.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 960.)

27

"It is, of course, misconduct for a prosecutor to 'intentionally elicit inadmissible testimony.' [Citations.]" (*People v. Bonin* (1988) 46 Cal.3d 659, 689, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) Defendants rely on the principle that a prosecutor has a duty to guard against statements by his own witnesses containing inadmissible evidence. (See, e.g., *People v. Warren* (1988) 45 Cal.3d 471, 481-482.) This is, of course, a corollary of the principle that it is misconduct for a prosecutor to intentionally elicit inadmissible testimony. (*People v. Bonin*, *supra*, at p. 689.)

Here, the prosecutor did not intentionally elicit any inadmissible testimony about Defendant Garcia being subject to a probation search or Defendant Gutierrez's prior convictions. Regarding Deputy Rhodes's testimony, we conclude the prosecutor's forgetfulness in admonishing the deputy not to refer to a probation search does not amount to prosecutorial misconduct. As the People point out, in addition to being inadvertent, there was no purposeful attempt by the prosecutor to elicit the inadmissible evidence. The record is void of any evidence from which to infer this prosecutor acted from improper motives. Even defense counsel believed there was no intentional misconduct, observing that "[i]n every aspect of this case, [the prosecutor's] been upstanding. I don't think it was done intentionally." Similarly, we see nothing in the record from which to infer this prosecutor acted from such improper motives. To rule otherwise, without more evidence of intent on the part of the prosecution, would put prosecutors at risk of charges of prosecutorial misconduct any time a court sustains an

evidentiary objection by defense counsel, coupled with or without admonishing the jury or further affirmative action.

Likewise, there was no prosecutorial misconduct involved in the gang expert's reference to Defendant Gutierrez having committed crimes with other members of Edgemont Locos. Detective Colmer's testimony did not violate the trial court's early ruling involving Defendant Gutierrez's prior convictions. As the trial court observed in overruling defense counsel's objection, "an arrest doesn't necessarily mean a conviction."

## VIII.  CALCRIM NO. 372 FLIGHT INSTRUCTION

Defendant Gutierrez contends that because CALCRIM No. 372, as "given in the present case permitted the jury to draw irrational inferences of guilt, its use undermined the reasonable doubt requirement and denied [him] his rights to a fair trial and due process of law."

### A.  Additional Background Information

The trial court instructed Defendant Gutierrez's jury with CALCRIM No. 372, as follows:  "If the defendant fled immediately after the crime was committed, that conduct may show that the defendant was aware of his or her guilt.  If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."[6] Defendant Gutierrez did not object to that instruction.

---

[6] Defendant Garcia's jury did not receive a flight instruction.

## B. Legal Principles and Analysis

The People contend Defendant Gutierrez has forfeited his challenge to the flight instruction because he did not make a timely and specific objection in the trial court. (*People v. Bolin* (1998) 18 Cal.4th 297, 326.) The People have nonetheless addressed the merits of the challenge, and to forestall any claim of ineffective assistance of counsel, we will also address the merits. (See *People v. Scaffidi* (1992) 11 Cal.App.4th 145, 151 [Fourth Dist., Div. Two].)

"On review, we examine the jury instructions as a whole, in light of the trial record, to determine whether it is reasonably likely the jury understood the challenged instruction in a way that undermined the presumption of innocence or tended to relieve the prosecution of the burden to prove defendant's guilt beyond a reasonable doubt. [Citation.]" (*People v. Paysinger* (2009) 174 Cal.App.4th 26, 30.)

The giving of a flight instruction in an appropriate case is statutorily required: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given." (§ 1127c.)

In *People v. Paysinger*, *supra*, 174 Cal.App.4th at pp. 30-32, the court held that the language of CALCRIM No. 372 complies with that statutory mandate and rejected the defendant's argument that the instruction deprived the defendant of the presumption of innocence and the requirement of proof beyond a reasonable doubt. Similarly, the court in *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, 1158-1159 (*Hernandez Rios*), rejected a due process challenge to CALCRIM No. 372 identical to Defendant Gutierrez's challenge.[7] Although Defendant Gutierrez contends *Hernandez Rios* was wrongly decided, we find his argument unpersuasive. Our Supreme Court repeatedly rejected challenges to a substantially similar version of the flight instruction in CALJIC No. 2.52. (See, e.g., *People v. Lynch* (2010) 50 Cal.4th 693, 761, overruled on another

---

[7] "Arguing that the 'culprit' in CALCRIM No. 372 is the word 'aware,' Rios contrasts CALCRIM No. 372 (which uses that word) with CALJIC No. 2.52 (which does not) and claims that the latter instruction 'left open the question whether the defendant was guilty by instructing that the defendant's flight could be considered as *evidence of guilt*' but 'not as *evidence of his awareness of his guilt.*' . . . [¶] On whether a flight instruction permitting a jury to infer 'awareness of guilt' is constitutional, the California Supreme Court's rejection of an analogous challenge to CALJIC No. 2.52 is instructive. . . . Noting that a permissive inference violates due process 'only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury,' *Mendoza* held that permitting 'a jury to infer, if it so chooses, that the flight of a defendant immediately after the commission of a crime indicates a *consciousness of guilt*' is not violative of due process. [Citation.]" (*Hernandez Rios*, *supra*, 151 Cal.App.4th at p. 1158.) *Mendoza* also rejected the defendant's assertion that CALJIC No. 2.52 unconstitutionally lessened the prosecution's burden of proof, citing *Francis v. Franklin* (1985) 471 U.S. 307, 314. (*Mendoza*, *supra*, 23 Cal.4th at p. 181.) In *Franklin*, the United States Supreme Court noted that an instruction that creates a mandatory presumption, which "instructs the jury that it must infer the presumed fact if the State proves certain predicate facts," relieves the State of its burden of proof, while a permissive inference, which "suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion," does not. (*Franklin*, *supra*, at p. 314, fn. omitted.)

31

ground by *People v. McKinnon* (2011) 52 Cal.4th 610, 636-643; *People v. Brady* (2010) 50 Cal.4th 547, 567 and cases collected; *People v. Kelly* (2007) 42 Cal.4th 763, 792 [finding that the flight instruction did not impermissibly dilute the requirement of proof beyond a reasonable doubt].)  We agree with the reasoning and conclusion of those courts and hold that CALCRIM No. 372 is constitutionally valid.  Clearly, the instruction creates a permissible inference, rather than a mandatory presumption, and thus does not impermissibly shift the burden of proof.  Moreover, like CALJIC No. 2.52, CALCRIM No. 372 "'adequately conveyed the concept that if flight was found, the jury was permitted to consider alternative explanations for that flight other than defendant's consciousness of guilt.'  [Citation.] . . . [A] *flight instruction does not create an unconstitutional permissive inference or lessen the prosecutor's burden of proof . . . .* [Citations.]"  (*People v. Avila* (2009) 46 Cal.4th 680, 710, italics added.)

IX.  DEFENDANT GUTIERREZ'S POSTTRIAL *MARSDEN* MOTION

Defendant Gutierrez contends the trial court abused its discretion in denying his posttrial *Marsden* motion and thereby denied him his constitutional right to counsel.

**A.  Further Background Information**

Following the jury's verdict, Defendant Gutierrez moved to substitute his appointed counsel on the grounds she had failed to present relevant evidence, namely, that he had a tattoo removed, that J.G. (the only person who identified him at trial) could not have seen him given her eyesight and the lighting, and that phone records showed that he did not answer Defendant Garcia's telephone call after the shooting.  At the *Marsden* hearing, Defendant Gutierrez stated that he wanted new counsel to file a motion for

32

retrial based on ineffective assistance of counsel for not introducing the above-mentioned evidence.

In response, defense counsel informed the court that the case was assigned to her in late December 2010, with trial set for early January 2011. Defendant Gutierrez had been proceeding in propria persona for about six to nine months. Defense counsel reviewed the file to determine what was missing and contacted prior counsel and the investigator appointed to assist Defendant Gutierrez. She then spoke with Defendant Gutierrez about "what the best possible theories were." Defense counsel noted that she prepared the case based on her knowledge and experience, including nine and a half years of practicing law. Regarding Defendant Gutierrez's concerns, defense counsel opined that "he had a difference of opinion with respect to which theory would be the best theory to proceed, which would be misidentification or the fact that he wasn't there." She explained that Defendant Gutierrez "had the right to testify and chose not to, which meant that certain information couldn't come in." Regarding the tattoo, defense counsel explained that the medical records failed to indicate what type of tattoo was removed.

The trial court inquired about the tattoo, and Defendant Gutierrez replied that he was in the process in 2009 of getting the letters "IE" removed. Regarding the cell phone records, he explained "I never answered the phone call. . . . [T]he D.A. was stating that [Defendant Garcia] called Toker Tokes to come shoot this guy up, but yet they called my phone after the crime was committed and I never answered the phone call. So how could I have spoke to her and been at that crime when she spoke to me after the crime was committed."

33

The trial court asked defense counsel how this evidence factored into her thinking. She replied that she considered whether the jury would believe the removal of the tattoo showed that Defendant Gutierrez was trying to separate himself from the gang lifestyle. However, because the medical records did not indicate the type of tattoo being removed, and there was other criminal information that the defense had already "402'd out," she did not think it was the best possible argument. The trial court noted that Defendant Gutierrez was in juvenile hall at the time the removal process was started. He was supposed to go six times for removal but went only twice. Regarding the phone records, counsel explained that while one phone from Defendant Garcia was not answered, the other ones were, and thus she "chose not to go further with that issue."

At the conclusion of the *Marsden* hearing, the trial court found the tattoo removal worked against Defendant Gutierrez because he only went to two out of six removal treatments and the tattoo remained. Regarding J.G.'s vision, the court (albeit erroneously) recalled there was more than one person who saw Defendant Gutierrez. And the matter of phone records was merely a peripheral matter. The court denied the *Marsden* motion, concluding that defense counsel had sound reasons for dismissing the proffered evidence.

## B. Legal Principles and Analysis

"'Once a defendant is afforded an opportunity to state his or her reasons for seeking to discharge an appointed attorney, the decision whether or not to grant a motion for substitution of counsel lies within the discretion of the trial judge. The court does not abuse its discretion in denying a *Marsden* motion "'unless the defendant has shown that a

failure to replace counsel would substantially impair the defendant's right to assistance of counsel.'" [Citations.] Substantial impairment of the right to counsel can occur when the appointed counsel is providing inadequate representation or when "the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." [Citations.]' [Citation.]" (*People v. Myles* (2012) 53 Cal.4th 1181, 1207.)

Contrary to Defendant Gutierrez's claim, none of his various complaints concerning counsel suggests an irreconcilable conflict between them. His main grievance was that defense counsel failed to follow up on the evidence which he deemed important, namely, the tattoo removal, J.G.'s poor eyesight, and the cell phone record. However, "'[t]actical disagreements between the defendant and his attorney do not by themselves constitute an "irreconcilable conflict."'" (*People v. Roldan* (2005) 35 Cal.4th 646, 682, overruled on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) As the trial court observed, the evidence that Defendant Gutierrez went to only two of the six tattoo removal treatments was at best problematic. His cell phone record was also problematic, given the evidence that only one of the calls from Defendant Garcia to Defendant Gutierrez was not answered. Regarding J.G.'s vision, defense counsel elicited her testimony that she had poor eyesight and was not wearing glasses or contacts on the night of the shooting. However, her trial testimony conflicted with her earlier statements to the deputies that she was wearing her contacts on the night of the shooting. Moreover, numerous witnesses heard Defendant Garcia asking "Tokes" to come over and "take care of" Jonathan or "hit up the house." Thus, the jury was presented with evidence of J.G.'s

poor vision, along with circumstantial evidence placing Defendant Gutierrez at the crime scene. As such, Defendant Gutierrez fails to show that the trial court's denial of his *Marsden* motion impaired his right to effective assistance of counsel. (*People v. Hart* (1999) 20 Cal.4th 546, 603.)

## X. WAS THE JURY PRESENTED WITH A LEGALLY INCORRECT THEORY OF CONVICTION

Relying on *People v. Guiton* (1993) 4 Cal.4th 1116, Defendant Garcia contends her convictions on counts 1 (attempted murder) and 3 (assault with a deadly weapon or by means of force likely to produce great bodily injury) must be reversed, because the prosecutor presented the case to the jury on a "legally incorrect theory" by misstating the law governing criminal liability for assault with a deadly weapon or by force likely to cause great bodily injury during closing arguments.

### A. Further Background Information

In closing, the prosecutor discussed Defendant Garcia's aider and abettor liability by providing an example: "[Defendant Garcia] intends for [Defendant] Gutierrez to commit a crime, for example, we'll say an assault. She knows that he's going to do it. She told him to. He does it. And before or during him doing it, she encourages him, for example, tells him to. I mean, verbal encouragement is encouragement. [¶] And what you have with aiding and ability is liability, responsibility. It puts you on the hook, for lack of a better term. That's what's created when you aid and abet. The scope of liability extends beyond the actual crime intended. You're liable for what you encouraged.

36

You're also liable for any other crime that is a natural and probable consequence of the crime that you encouraged."

In response, defense counsel argued: "Now, to have a natural and probable consequence theory, you have to have a target offense. That target offense is what she intended to have [Defendant] Gutierrez commit, and that it was a natural and probable consequence of that target offense that led to the attempt murder of Mr. Williams. And in your paperwork that you receive, your instructions, you will learn that the target offense that the District Attorney has alleged is that [Defendant] Garcia intended for there to be an assault with a deadly weapon or by force likely to commit great bodily injury. [¶] So for you to find [Defendant] Garcia guilty, you have to decide that what she did is she intended to have Jonathan . . . either murdered or she intended to have him assaulted with great bodily injury, either through the use of a weapon or any means necessary or available to commit great bodily injury upon his body. [¶] And again, you don't have that either. . . . [¶] . . . [¶] . . . [E]ven if it were there, then they would need to prove to you that it's a natural and probable consequence, to reach the next level of attempt murder. And how do they do that? By trying to make this look like a gang case. [¶] Because you know gangsters, when you call gangsters, sometimes assault with deadly weapons turn[s] into murders."

In rebuttal, the prosecutor elaborated on Defendant's Garcia's liability:

"So what it comes down to in this case is the analysis that I started with in my initial closing argument. It's a question of liability. Every single witness agrees [Defendant Garcia] got on that phone and she made a phone call because she was angry.

37

She lost her temper. She knew who she was calling. She knew his personality. She knew his associations, his affiliations, and she called him. Of all 84 contacts, she picked Tokes.

"She told him to come over to the house and to do some form of violence. I'm not trying to tell you that she said shoot the house up. We don't know exactly what she said. It's a party. Things can be chaotic. Details can be lost. But she asked for some form of violence.

"At an absolute minimum, bare minimum, I think we can all agree, she wanted someone to come and scare the bejesus out of Jonathan . . . right? Even if she didn't want him touched, which I argue to you she did, at a minimum, she wanted him scared to death.

"What do you call it when a gangster comes over and scares someone to death? It's an assault. It's like a swing and a miss. Remember when we talked about an assault. One way is to swing a baseball bat and try to scare someone. If they come up and they start punking him, you know, twitching, flinching, making him think he's going to get punched, think he's going to get beat severely, that's an assault. And that's the bare minimum of what she was saying. It was probably much more.

"[DEFENSE COUNSEL]: Misstates the law, your Honor. Objection.

"THE COURT: Overruled.

"[THE PROSECUTOR]: It's because that is the law. You've got the instructions.

"If you do something that makes someone think they're going to get hit, you know they think they're going to get hit, you intend to scare them and you could hit them, that's

38

an assault.  It's in the law, it's right there.  That's the bare minimum of what she wanted to do.

"So she's liable.  She's aiding and abetting an assault.  That's step one.

"The question before you then becomes—

"[DEFENSE COUNSEL]:  Your Honor, I'm going to object.  It's a misstatement of the law.  It's not an assault.  It's assault with a deadly weapon.

"THE COURT:  Overruled.

"[THE PROSECUTOR]:  No, It's not assault with a deadly weapon.  It's assault likely to inflict great bodily injury, something that's more than mild or moderate.  Skinny, little, 16-year-old kid getting jumped by gangsters, that's going to inflict great bodily injury that's more than mild or moderate.  And that's—you can't make the law up.  I mean, it's written down."

The prosecutor then argued the attempted murder was the natural and probable consequence of the assault which Defendant Garcia specifically intended to aid and abet.  The jury was instructed with CALCRIM Nos. 400, 401, 403, and 875.

### B.  Legal Principles and Analysis

The parties disagree on whether this is simply a situation where the prosecutor alone introduced an improper legal theory, or whether the trial court "presented the state's case to the jury on an erroneous legal theory or theories."  (*People v. Morales* (2001) 25 Cal.4th 34, 43.)  "When a prosecutor relies on alternate theories, some of which are legally correct and others which are legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt

rested, the conviction cannot stand. [Citations.]" (*People v. Mendez* (2010) 188 Cal.App.4th 47, 59; see also *People v. Guiton*, *supra*, 4 Cal.4th at p. 1122.) However, *Guiton* error does not occur when a prosecutor's misstatement of law "merely amount[s] to prosecutorial misconduct [citation] during argument, rather than trial and resolution of the case on an improper legal basis." (*People v. Morales*, *supra*, at p. 43.) We conclude that the People have correctly identified the issue as one of prosecutorial misstatement of the law.

While it does appear that the prosecutor proceeded on a legally incorrect theory by intimating to the jury that an intent to frighten Jonathan provided a sufficient basis for a finding of aiding and abetting guilty as to Defendant Garcia, the prosecutor ultimately clarified that Defendant Garcia aided and abetted an assault likely to inflict great bodily injury when she intended to have a "[s]kinny, little, 16-year-old kid get[] jumped by gangsters . . . ." Furthermore, despite the trial court's rulings and comments during closing argument, Defendant Garcia acknowledges the "written instructions provided to the jury on assault with a deadly weapon or by means of force likely to produce great bodily injury were legally correct." The jury was also instructed with CALCRIM No. 200, which provided, "If you believe that the attorney's comments on the law conflict with my instructions, you must follow my instructions." These instructions did not permit a conviction solely on evidence of simple assault, but required the jury find that Defendant Garcia encouraged Defendant Gutierrez to commit an act that by its nature would directly and probably result in the application of force likely to produce great bodily injury.

40

Assuming the prosecutor's misstatement rises to the level of misconduct, we conclude that the misconduct did not prejudice Defendant Garcia. As the People aptly point out, at least one witness heard Defendant Garcia follow up her threats of gang violence by requesting Defendant Gutierrez to bring friends and guns and shoot up the house. This evidence clearly supports a finding that Defendant Garcia intended to have Defendant Gutierrez and his fellow gang members commit a violent act, not a mere "punking" of Jonathan.

For the above reasons, we reject Defendant Garcia's claim.

## XI. CUMULATIVE ERROR DOCTRINE

Both defendants argue that, even assuming the above-asserted errors are considered harmless in isolation, their cumulative impact renders them prejudicial. We have rejected these claims of error. Even assuming error, and viewing the errors as a whole, we conclude that any errors do not warrant reversal of the judgment. (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

## XII. DISMISSAL OF GANG CHARGE AND ENHANCEMENTS

Defendant Garcia's jury found her guilty as charged in all four counts and found the principal armed and gang allegations to be true. She moved for a new trial, arguing in part that the evidence was insufficient to support her conviction of actively participating in a criminal street gang (§ 186.22, subd. (a); count 4) and that the offenses (counts 1-3, inclusive) were committed for the benefit of, at the direction of and in association with a criminal street gang (§ 186.22, subd. (b)). The trial court agreed, finding that Defendant Garcia did not fit the definition of section 186.22, subdivision (a), and that the court

41

should have previously granted Defendant Garcia's section 1118.1 motion. Count 4 was dismissed. As to the gang enhancements, the trial court found that Defendant Garcia was not in association with a criminal street gang, but that she was in association with "a specific person, [Defendant] Gutierrez." Noting, again, that it should have granted the section 1118.1 motion, the court struck the gang enhancements.[8]

The People appeal the trial court's postverdict order dismissing the gang enhancements and gang offense as to Defendant Garcia.

Regardless of the motion presented to the trial court, the record indicates the court dismissed count 4 and the gang enhancements pursuant to section 1385. Under section 1385, a trial court may dismiss a charge or enhancement for legal insufficiency of the evidence after a jury has returned a guilty verdict or true finding. (*People v. Hatch* (2000) 22 Cal.4th 260, 268 ["trial courts historically have had the power to acquit for legal insufficiency of the evidence pursuant to section 1385"].) When a trial court analyzes a motion to dismiss for insufficiency of the evidence, it must review "the entire record in the light most favorable to the verdict" and determine whether there is

---

[8] The parties agree the trial court attempted to make two orders after the jury returned true findings as to the gang allegations and a guilty verdict on the substantive gang charge. The court dismissed the gang allegations and the substantive gang charge based on legal insufficiency pursuant to section 1385. However, the court later attempted to grant Defendant Garcia's motion for new trial based on its view of the evidence as a "13th juror" under section 1118.1. The legal effect of a dismissal under section 1385 is an acquittal of the defendant. It is a final termination of the charge or enhancement, and it is within the category of a judgment. (*People v. Superior Court* (1963) 217 Cal.App.2d 517, 519.) Thus, once the judge dismissed the gang allegations and the gang charge, those portions of the action no longer existed such that the trial court could not have alternatively granted a motion for new trial.

substantial evidence which would permit any rational jury to find the defendant guilty beyond a reasonable doubt." (*People v. Salgado* (2001) 88 Cal.App.4th 5, 15.) On appeal, we engage in the same task as the trial court and determine whether there was sufficient evidence to permit a rational jury to convict. (*Ibid.*; *People v. Hatch*, *supra*, at p. 272.)

In order for the jury to convict Defendant Garcia of active participation in a criminal street gang (§ 186.22, subd. (a)), the prosecution had to prove the defendant actively participated in a criminal street gang, knew that members of the gang engage in or have engaged in a pattern of criminal activity, and willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang either by directly and actively committing a felony offense or aiding and abetting a felony offense. (§ 186.22, subd. (a).) According to the trial court, the evidence did not show that Defendant Garcia met the definition of "active participation" in the Edgemont Locos "as a matter of law." Rather, the court defines active participation as involvement that "'is more than passive in name only.' [Defendant Garcia] didn't do that." We disagree.

Here, Defendant Garcia's involvement with Edgemont Locos was more than nominal or passive. Upon feeling disrespected, she summoned her "homies" (members of Edgemont Locos) to take care of Jonathan and "shoot up" the house. She stated that Jonathan needed to be taught a lesson and that she had friends in Edgemont. When Williams attempted to defuse the situation, reminding Defendant Garcia there were children present, she said that she did not care, that she was calling her "homies from Edgemont," and that something was going to happen. She added, "No one disrespects

43

me." When Edgemont gang members arrived, she pointed out D.H.'s mother. Williams's attempt to intervene resulted in his being stabbed and shot at. Defendant Garcia and her "friends" took off, only to later regroup at Defendant Garcia's home. During a search of the residence, deputies discovered ammunition in the garage, and a loaded revolver and speed loader hidden in a couch cushion. The revolver previously had been reported stolen. Clearly, Defendant Garcia actively participated in the gang by aiding and abetting the crimes of attempted murder, assault with a firearm, and assault with a knife. Her actions were more than nominal or passive. Thus, the trial court's order dismissing the substantive gang charge under section 186.22, subdivision (a) is reversed.

In order for the jury to find true the gang enhancement allegations (§ 186.22, subd. (b)) the prosecution had to prove (1) the commission of the offense was "for the benefit of, at the direction of, or in association with" a gang, as defined in the statute, and (2) the defendant had the specific intent to promote, further or assist in any criminal conduct by members of the gang. (*Albillar*, *supra*, 51 Cal.4th at pp. 66-67.) Proof of the requisite specific intent requires substantial evidence that the defendant acted "'with the specific intent to promote, further, or assist in *any* criminal conduct by gang members.'" (*Id*. at p. 67. ) "Criminal street gang," is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated . . . having a common name or common identifying sign or symbol, and whose members individually

44

or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

To begin with, we previously found sufficient evidence to support the gang enhancements as to Defendant Gutierrez. Considering the same evidence, we conclude that sufficient evidence supports the gang enhancements as to Defendant Garcia. In addition to the testimonies of the witnesses who were present at the party, the prosecution introduced the testimony of a gang expert, Detective Colmer. He testified that the Edgemont Locos was a criminal street gang. Contrary to the trial court's finding that Defendant Garcia was not associated with a criminal street gang, but with a specific person, namely Defendant Gutierrez, the record shows otherwise. Defendant Garcia called her "homies" after she believed that she had been disrespected. She announced that she had friends from Edgemont and was going to have them come over and "hit up the house." Witnesses heard Defendant Garcia yelling, "Bring a strap [or] bring guns," and "Come over [and] . . . [s]hoot everybody up." This call indicates planning and direction, supporting the conclusion that the attack on Williams was at the direction of the Edgemont Locos gang.

In response, three gang members, including Defendant Gutierrez and Avila, showed up armed and dressed as if they were on a gang mission. Avila stabbed Williams and then ordered Defendant Gutierrez to shoot Williams. J.G. confirmed that all three men were from Edgemont. Both defendants specifically referenced Edgemont during the incident. Defendant Garcia referred to the gang when she threatened Jonathan and called Defendant Gutierrez to respond to Jonathan disrespecting her. Defendant Gutierrez

45

announced "Edgemont" just before shooting Williams. Clearly, Defendant Garcia acted in association with Edgemont gang members during the attack. Afterwards, the assailants, including Defendant Garcia, coordinated their flight from the scene and hid the weapon used. According to Detective Colmer, the attack benefitted the Edgemont Locos gang by providing "experience" for its members and by increasing the gang's street reputation for committing violent acts. Again, the gang members announced "Edgemont" before the attack. Such announcement supports a finding that the attack was committed to benefit the gang.

Certainly the jury did not have to believe the expert. It could have had a reasonable doubt as to whether Defendant Garcia's reference to having friends in Edgemont was merely referring to the neighborhood, rather than to a gang. Or it could have concluded that the expert was simply not credible. If the jury did believe the expert, however, the expert's testimony was sufficient evidence that the crimes were committed "for the benefit of, at the direction of, or in association with" Edgemont Locos. Likewise, if Defendant Garcia's actions were for purely personal motives, there was no reason for her or her friends to announce the gang's name unless, as the expert testified, it was to benefit the gang. This was sufficient evidence. (See *People v. Mendez*, *supra*, 188 Cal.App.4th at pp. 56-57 [expert testified that crime benefited gang, because defendant asked victim if he was "from anywhere" and announced gang name].)

46

The above provides substantial evidence to support the first prong of the gang enhancements, i.e., that Defendant Garcia committed the underlying felonies for the benefit of, at the direction of, or in association with the Edgemont Locos criminal street gang.

Regarding the second prong, the record shows that Defendant Garcia became upset and felt disrespected by a comment made by Jonathan. She told everyone present that she was going to call her friends and "hit up the house," along with taking care of Jonathan. Defendant Garcia said her friends were from Edgemont. When Williams attempted to calm Defendant Garcia down, she refused. After Edgemont gang members showed up in response to her phone call, she directed them as to who needed to be taken care of. Defendant Garcia was convicted of attempted murder, assault with a firearm, and assault with a knife. Given this evidence, Defendant Garcia clearly had the requisite intent to promote, further, or assist the criminal conduct of the Edgemont Locos gang.

For the above reasons, the trial court's order dismissing the gang-related enhancements under section 186.22, subdivision (b) is reversed.

## XIII. DISPOSITION

The trial court's order dismissing the verdicts and findings of the jury as to the substantive gang charge (§ 186.22, subd. (a); count 4) and the gang enhancements (§§ 186.22, subd. (b) and 12022.53, subd. (e); counts 1, 2, & 3) relating to Defendant Garcia are reversed, and the verdicts and findings are reinstated, along with defendant

47

Garcia's right to file a motion for new trial.  In all other respects, the judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>       HOLLENHORST      </u>
Acting P. J.

We concur:

<u>      RICHLI          </u>
J.

<u>      CODRINGTON    </u>
J.